We'll hear the last case on the calendar, United States v. Westchester County. Thanks. Good morning, Your Honor. My name is Robert Meehan, attorney for the Appellant County of Westchester. This is a consolidated appeals brought under a decision of the lower court involving several paragraphs of the stipulation of settlement in this underlying case. In both instances, we contend that the district court applied the incorrect standard and misinterpreted the provisions of the contract, and therefore resulted in an erroneous conclusion. With respect to paragraph 32, the analysis of impediment or AI, the district court applied the standard that acceptance by HUD is the only standard. But it says, it says that you were supposed to produce an AI which was acceptable to HUD. You haven't done so, or you didn't do so at the time that the district court ruled, so that all the talk about what's happened after doesn't really interest me, because we're reviewing what the district court held at that time. You hadn't done so, so it's the end of that. Your Honor, the standard is not carte blanche unfettered discretion by HUD, but, in fact, in any satisfaction contract where the satisfaction is the standard, it's reasonableness. The order and agreement was that something should be produced, an AI which was acceptable to HUD. You didn't do so. The district court said that is a violation. An agreement between two parties has to have some element of reasonableness. Otherwise, it's not an agreement. You mean we are supposed to decide whether HUD finding that your failure to do that was reasonable or not? In every instance, we have to go and look to whether HUD was being reasonable? I mean, I find it very hard to find whether courts are reasonable, but to find whether an agency of the federal government acted reasonably in one administration or another is asking me to do something that's absurd. Well, that would be true, and it was true in the prior decision where the agency was acting under a federal statute where they had agency discretion, but this is not. This is a contract. Are you suggesting that paragraph 32 is unenforceable because it's a contract of adhesion or something to that? No, not at all, Your Honor. All we're saying is that it must be interpreted as a contract in this instance. What are you saying, that the county did comply? First, I'm saying that the district court applied the wrong standard, did not critically look at the evidence. The government didn't even provide any evidence that we breached. They simply assumed it. They said, well, HUD didn't accept the AI, therefore it must be wrong, but there was no critical examination. Are you arguing that the county complied with paragraph 32? Yes, Your Honor. How did the county comply with paragraph 32? Over this long period of time, the AI was submitted beginning in 2010. There was many iterations and narrowed it down. We've already held that those earlier iterations were not acceptable. In the context of the agency refusal to comply. Are you asking us to go back and revisit our earlier decision? No, Your Honor. I think if you go back and look at the earlier decision, the court specifically said that the contract issue was not decided. Whether or not this is a breach of contract, the submission of the AI that's been submitted by the county is a question of reasonableness. The county's position here is not that zoning doesn't play a factor in affordable housing. I still don't understand. A contract can be entered into which requires approval of somebody. Unless it says something about that approval has to be reasonably granted or something of that sort, that is a specific term of a contract. That somebody has done X and X has not been done. I've never seen in a contract then to say, well, maybe that wasn't really what it said. Well, I think all contracts, there has to be reasonableness. And usually there's a satisfaction has to be some reasonableness involved. It can't just be completely one side. It wouldn't be an agreement. It'd just be whatever HUD wants to do it. So how is that even a consent decree? It's not. It's just HUD's going to dictate to the county what the county's going to do. Yes, exactly. That's what you have agreed. Well, we take exception and say that that is not the law. The law is it has to be reasonable. You might be arguing that there are due process violations or all sorts of things you haven't made, but you haven't made a contractual argument because that's a contract you entered into. Well, I'm arguing the standard that has to be applied. First, the standard has to be reasonableness. Then on the facts, we have to take a critical analysis of the determination of what constitutes an impediment to fair housing. When did you submit an A.I. that you contend complied with Paragraph 32? Well, our county's position has been we've been submitting them over and over again. When was the last time? The last one was recently after this case was submitted on March 20th, 2017. After this case was submitted is not. . . I agree. Unless you can argue that it moots the case, which is very difficult because. . . I'm not arguing that. No. And I was just responding to the question. It is an ongoing state of affairs. Are you. . . I'm trying to figure out what you're arguing. Are you contending that any of the earlier A.I.s complied, the ones that we've already ruled on? Yes, Your Honor. We're contending that. But at a minimum, we contend. . . How do we. . . At a minimum, we contend. . . You're asking us to reverse what the prior panel concluded? I think there's enough evidence. . . Not the prior panel. No. The prior panel had to do with funding. Funding from the federal government, which was an issue of arbitrary and capriciousness. This has to do with a contract. Whether or not there's reasonable interpretation of the contract. The standard that the district court applied was incorrect. And on the facts, we think we will prevail. But at the very minimum, this has to go back to the district court for reconsideration. Based on the standard that was applied. There was no critical analysis whatsoever. It was just assumed that the county's analysis is flawed. That the data was inaccurate. That's not true. The data is the data. We've been using census data. Are you arguing that the initial consent decree does not apply now because funding is not being sought? Not at all, Your Honor. We're here discussing. . . You're not making any of the arguments that could conceivably be new. You're just saying, although the contract reads this way, we don't think it's reasonable for the contract to read that way. No. I'm saying that the law says that the contract must be read that in reasonableness is part of the law. And then it's a factual question of whether or not there was a breach. But you've got to get past the law, which is the standard which the district court applied the wrong standard. I want to get to paragraph 7. 7i and 7j. Same thing. The district court applied the wrong standard. Misinterpreted the contract. First of all, because paragraph 23, the benchmarks, didn't trigger. We met the benchmarks. So we never triggered where we got to paragraph 7i and 7j. 7i and 7j say discretion to the county. Where does it say discretion? It says as appropriate. As appropriate. And as appropriate has another meaning, which means something which will work. In that same section, the word discretion is used any number of times. They knew perfectly well when they wanted to give discretion to one party or another. And in that contract, they never used, in the part you're talking about, they never used discretion. You know, I rarely get angry. But it seems to me that what is going on is consistent evasion, consistent trying each time to find something new, why you shouldn't live up to something that you agreed to. And that is bad when parties do it. It is outrageous when the government does it. This, going to 7i and 7j, the Conifer project has been a project over five years. I think the county has spent more effort and hours in working on this project than any other one that we've done. So all we're saying is there was discretion. Did you use financial incentives when the town didn't comply? The answer to that is certainly. We put $2.9 million into this project.  But that section says that if a municipality opposes, you are bound to do certain things, including financial ones. And as you've just told me, you didn't do that. So why can't a district court find that you were in violation? First of all, local government and local zoning is a complex process. Unlike the other case, the prior case where the discretion is to the expertise of the agency, now it's to the expertise of the local officials. This was a moving concept here. The county was dealing with the town, working out easements with the town, working out water lines with the town, working out . . . And the district court found that the requirements of 7i and 7j's of what you should do, you had not done. Now, let me say something else. The other two judges on this panel have been on prior iterations of this case. I am new to it, which is one of the reasons I'm being as aggressive as I am, because they have already spoken to this. I have looked at this new and looked at it from the standpoint of somebody who would say, is the town making any arguments that seem to be anything new or real? And, I've got to tell you, I ain't found a single one. Well, all I can say on the fact, Your Honor, the county has done quite a bit here. We negotiated with the town. We negotiated with Conifer. Sometimes they were in conflict. We had New York State, the Department of State, the Attorney General had to have an approval on this. The New York State DOT, we dealt with them for a year and a half. My office alone dealt with them. Worked hard to get that easement. It ended up being an easement. Originally, it was a lease. We got the easement. Everything's in place right now. And, as of when this record was submitted, we had a building permit which . . . Everyone, at some stage, has said that is not what the contract meant because you can't build with it. So, now coming in and telling us that for our purposes, we should treat what everybody has agreed was not enough to get the buildings done, is again something I find extraordinarily difficult to have the government come up and stand up and argue. It goes back to the benchmarks, Your Honor. We met the benchmarks. So, then we had another year to get that building. And, the bottom line is, we don't even count. We don't need to count this. We have 790 building permits as of December 2016. This is 28. If you take off the 28, we still make the 750. We're in compliance. That is an argument as to what has happened since the district court has decided. If it is, in fact, that you are in compliance, that now the 750 have been built, and that may well be, and that would be lovely, and I would congratulate you all on it. Then, you go back to the district court and you say, this part is no longer in violation because we are in compliance. And, that's perfectly fine. But, that's not the issue before us. The issue before us is, at the time the district court decided, was there evidence to the district court that 750 had been done regardless of Chappaqua? Well, at that time, we weren't required to have the 750. We had a different number, which was conceded that we had met the number. So, yes, it should go back. Maybe it should go back to the district court, but certainly not on the standards that the district court applied to this case. All right. Thank you. You have a little time for rebuttal, but we'll hear from the town. Good morning, your honors. Edward Phillips for Amicus Town of New Castle. Thank you for hearing me this morning. There's a lot of ground that I'd like to cover. I've attended every public meeting and public hearing on this matter from 2014, 15, and 16. But, I'd really like to just focus you on two in particular. One is with respect to the testimony of our town building inspector before the New York State Board of Review. The town has been criticized by the lower court, by the government, who have said that that testimony hindered the issuance of a building permit for this project. It did not. The building inspector, and the lower court got this a little wrong, the building inspector does not have any authority or legal authority to issue a variance. The building inspector can only identify the need for a variance, which he did. Only the Board of Review can actually grant the variance. Now, our building inspector said that the project needed eight variances. The Board of Review agreed with him and affirmed that determination. And, at least in the first go around, also decided that the project didn't warrant the issuance of seven out of those eight variances. Now, the building inspector's testimony, you've read the hearing transcript. It's in the record. You've seen that the written submission is at 417 of the joint appendix. It's all about fire safety. Now, what is the lower court— Here's my problem with this. I respect your building inspector saying those things and saying that is why this can't be done yet and so on. I respect the town selectman or whatever he's called, supervisor, campaigning in a particular way, and that is his right under free speech to say whatever he wants. Absolutely, they can all do that. But if, as a fact, that makes it more difficult for these things to be built, even though they're perfectly okay, if they are things that make it more difficult for these things to be built, why doesn't that trigger the obligation of the county to do something to get over that, including making financial payments? And that's the only issue before us. It's not whether you had a right to oppose or whether there was these requirements. It's whether, given those things, what this was about, getting housing for low-income people in this area was being hindered, was being made more difficult, which triggers their duty then to do something. And so I'm not saying anything bad about you guys. I'm just saying that those things weren't being built, and therefore the other people had some duty. But, Judge, the answer to that question is that none of the words or actions by the town officials, the building inspector, the town supervisor actually made it more difficult for this project to proceed. In some ways, they made the project better. There were a lot of project modifications that came out of the board of review process that improved its fire safety characteristics. And when the applicant came back to the town board and said, the board of review just changed our project, we need changes to our special permit so we're in compliance and can go forward, the board of review granted all of those requests and did it promptly and extended the duration of their special permit. Now, yes, did they say that they weren't happy with the project location? They certainly did, and they continue to believe that. But did they say or do anything that actually hindered the building inspector from issuing a building permit? The answer is no. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the court, my name is David Kennedy, and I'm an assistant United States attorney for the Southern District of New York, and I represent the government in this case. These are now the sixth and seventh appeals by the county from the district court's efforts to enforce the consent decree in this case. The sixth appeal is similar, and the issues are already familiar to the court. This court has previously recognized that the county was obliged to prepare an analysis of impediments to fair housing that would be acceptable to HUD, that the county has persistently failed to do so, and that HUD's refusal to accept the county's inadequate analysis was neither arbitrary nor capricious. Accordingly, the district court appropriately directed the county to do no later than April of this year what the consent decree had obliged to do before the end of 2009. Mr. Meehan says that there was no critical analysis whatsoever of the contents of the AI. That is a gross misstatement. There's been lengthy, extended analysis, which I even apologized for repeating in this brief because it had been repeated in so many previous briefs before this court. It is in our brief at page 41 through 45. Among the problems that we have been talking about existing in the county's AI, and again this is something like the fourth red brief we've put this in, was that the county admitted that its analysis relied on a mode of analysis that was, quote, subject to a high rate of error. We had some concerns about that. The second point that we've made consistently is that the county uses data inconsistently. It goes back and forth between data from Census 2000 and Census 2010. The county should use the same set of census data in doing the analysis. Again, we've said that over and over again. They also sometimes would include populations in group quarters as part of the minority population in contravention of the consent decree. So, for example, in the case of Bedford, the county included prison inmates in a woman's prison as part of an analysis as to whether there was exclusionary zoning in Bedford. Obviously, you're in prison. The zoning of the town doesn't really have much to do with you. We've complained about that for four red briefs now. Third, we pointed out that the county's conclusion that minimum lot sizes had no disparate impact was unsupported by sound reasoning. Often, the county would omit certain zones from their little charts, saying that there was no disparate impact. Point four, even when you use the county's cherry-picked data, sometimes we saw you would see minority populations drop off as the lot sizes got bigger. We used the example of North Castle as distinct from New Castle. Fifth, we pointed out many, many times the county failed to address why the minority population of many of these municipalities was so low. Many of these towns that are the subject of the analysis have African-American populations of 1.5, 1.2, 1.3. The county's population as a whole is 14.6 African-American. And then finally, we pointed out that there is a linkage between the likelihood that minorities in West Cheshire will use multifamily housing, so they need multifamily housing, and the absence of multifamily housing in many of these towns. So, again, this is analysis that, as I said, has been in four red briefs so far. It comes from HUD's analysis of the county's deficient AIs. We've made it many, many times before. So for Mr. Meehan to say that there was no critical analysis whatsoever is not correct. Would you address Mr. Phillips' argument? Yes. I think Judge Calabresi has it right. Chappaqua can do what it wants, and we certainly don't take any issue with the comments of the building inspector with regard to fire safety. People should be safe, obviously. Our concerns with the town, our concerns are twofold, that when the county decided to include these units as part of the units that it needed to meet the benchmarks, then we have to scrutinize it. And there may have been other units that the county could have used instead and did not, but once the county says we need these units in Chappaqua to meet the benchmark, we have to look and see what is the county doing to bring it forward. And with all deference to Mr. Phillips, this is a project that has spent years on the drawing board, has taken years to go forward. You're saying that delay, even for good reasons, is the same thing as hindering, and it triggers the duty of the county to do something to ameliorate the delay. Yes, because a lot of what's going on here is technical. You know, can we reconfigure the project in such a way to improve fire safety? Well, there's answers to that. There are people you can hire. You know, there's money involved in order to redo the plans. The county could have stepped in to help that, didn't do that. There was one comment by the building inspector that he would put this application all the way to the bottom of the pile, that I think does show a delay. But overall, our point is that there's an issue. It does show a nefarious delay. It does, yes. It does show a nefarious delay. But to view this in a more constructive light, in trying to locate affordable housing and trying to make sure everybody's needs are met, you often need to spend a little money, get a little experts, make changes to the project, and the county didn't really help with any of that. Your argument is that the consent decree had the county agree that they would be forthcoming, do things to make up for those delays which we understand happened. Absolutely. The district court's finding that that had not occurred is a finding that is supported by the evidence. Completely, Your Honor. And that should be the end. That is the end. And so for these reasons, we ask that the court affirm the district court. Thank you. Thank you. We'll hear the rebuttal. As far as the AI analysis, the problem with the result or the critical, they say, with flawed data, flawed analysis, incorrect data. Your argument before was that there was no analysis and that the brief goes through all of the analysis. What I was talking about was that the government wants the county to come to one conclusion and one conclusion only. One of them is that single-family zoning is a cause of lack of diversity. It's never established, never been established, and it must be established under the Texas Department of Housing Inclusive Communities case. There has to be a link between the statistics and HUD's relying only on the statistics. They say our analysis is no good because you didn't do it. A lot of those that Mr. Kennedy just referred to were corrected in the eighth analysis. But what I'm saying is we never really, other than the county's analysis is wrong and flawed and you're relying on the wrong data, it's never all conclusory, never specific. And when HUD comes to the conclusion that single-family zoning is a cause of lack of diversity, we can't accept that conclusion because it's clearly wrong, clearly wrong. They say, well, you must come to that conclusion. Well, all your conclusions are wrong because you didn't come to that conclusion. Now, as far as the Conifer case, as I said before, the county over a five-year period did a tremendous amount of work. They were moving parts. Offering the town incentives wasn't necessary or even asked for. We have facts on the case. First of all, I said that the standard that the district court applied, the interpretation of the conduct was incorrect. And if you look at the declarations, Norma Drummond, Anthony Zeno, David Futura, the number of hours that was invested by the county working to get this project over the finish line, and we believe it will be at some time, still the units have to be built. And this is where discretion and local government comes into play. You have to have some understanding of the hearings and the different players. There were so many different players here. We had the MTA, the New York State DOT. We have the Planning Board and the Newcastle, Newcastle Engineer, Newcastle Water Department. So one time, our planning department was making excuses. No, Your Honor, I think I'm just trying to give you some flavor of what a project from a municipal government's point of view entails. And it entails a lot. You have different people. You have the developer who has different interests, certainly from some of the governments involved. The governments have different interests from each other, perhaps. It's a very complex, and this is in the declarations. This is one of the most complex projects that have been proposed. The county at every step. Thank you. We'll take the matter under advice. That concludes. I'm sorry? There's a rebuttal. No, no, no, no. He had two minutes total. We'll reserve decision. I'll ask the clerk to adjourn. Thank you.